UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

FRIEMA NORKIN,

                    Plaintiff,

        -v-

OAK POINT PROPERTY LLC,
OAK POINT PROPERTY, INC.,
OAK POINT ENERGY LLC, and
STEVEN E. SMITH,

               Defendants.

----------------------------------------------------------------x

No.  15-cv-4773

ECF Case

**COMPLAINT**

Plaintiff Friema Norkin ("Plaintiff"), by her undersigned attorneys, for her complaint against defendants Oak Point Property LLC ("OPP LLC"), Oak Point Energy LLC ("OPE"), Oak Point Property, Inc. ("OPP, Inc.") and Steven E. Smith ("Smith") alleges as follows:

INTRODUCTION

1.      Prior to November 2001, a company called ABB Equity Ventures, Inc. ("ABB") sought to acquire a valuable parcel of real estate in the Bronx, New York, upon which ABB intended to develop a power plant.

2.      As part of those efforts, in November 2001, ABB entered into a written agreement with Plaintiff, who held an interest in the stock of the corporation that owned the premises.

3.      As relevant here, under the terms of that agreement, if the power plant project did not come to fruition and ABB sold or otherwise disposed of interests in the premises totaling in excess of $10,000,000 net of costs and expenses, Plaintiff would

be entitled to receive supplemental consideration from ABB in an amount up to $1,500,000.

4.      ABB subsequently assigned all of its rights, interests and obligations in the power plant project and the premises to defendant OPP, Inc.

5.      Following a series of transactions orchestrated by defendant Smith, who directly or indirectly owns or controls each of the corporate/LLC defendants, defendant OPP LLC acquired title to the premises.

6.      Although the power plant project was eventually abandoned, defendants caused the sale or disposal of interests in the premises totaling more than $22,000,000 which, even after deducting for costs and expenses, far exceeded the $10,000,000 threshold necessary to trigger the supplemental consideration provision of the agreement.

7.      Following the sale and dispositions of interests in the premises, Plaintiff made a demand for payment of the supplemental consideration, but defendants have refused to pay her any money.

8.      Plaintiff now brings this action to recover the supplemental consideration due under the agreement in the amount of $1,500,000 plus interest.

9.      In addition, should any of the defendants found to be liable under the agreement lack sufficient funds to make payment in full as a result having transferred the premises or other assets without adequate consideration and without regard for the debt owed to Plaintiff, Plaintiff seeks an order allowing her to pierce or disregard the corporate or LLC form and to recover the amount due directly from any defendant who holds title to or otherwise benefitted from the acquisition of the premises.

## PARTIES

10.     Plaintiff Friema Norkin is a citizen of the State of New York and a resident of Bronx County, New York.

11.     Upon information and belief, defendant OPP LLC is a limited liability company organized under the laws of Delaware.

12.     Upon information and belief, defendant OPP, Inc. is the sole member of OPP LLC.

13.     Upon information and belief, defendant OPP, Inc. is a corporation organized under the laws of Delaware with its principal place of business in New Jersey.

14.     Upon information and belief, defendant OPE is a limited liability company organized under the laws of Delaware.

15.     Upon information and belief, defendant Smith is the sole member of OPE.

16.     Upon information and belief, defendant Smith is a citizen of New Jersey.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) insofar as Plaintiff and defendants are citizens of different states and the amount in controversy in this action exceeds $75,000, exclusive of interest and costs.

18.     This Court has personal jurisdiction over all defendants pursuant to CPLR § 301 because defendants are doing business within the State of New York or,

alternatively, are subject to long-arm jurisdiction pursuant to CPLR § 302(a) based on their transaction of business and/or ownership of real property in the State of New York.

19.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district and/or because a substantial part of property that is the subject of this action is situated in this judicial district.

FACTS ALLEGED

The Norkins and the Formation of Britestarr

20.    Plaintiff and David Norkin were married in 1958.  At all times during their marriage, Plaintiff was a homemaker who had no experience with business or finance.

21.    In or around 1986, David Norkin formed a corporation called Britestarr Homes, Inc. ("Britestarr").

22.    David Norkin caused all the outstanding shares of Britestarr's common stock to be issued to Plaintiff.

23.    David Norkin caused himself to be appointed as president of Britestarr.

24.    In or around September 1988, David Norkin caused Britestarr to acquire four parcels of vacant land totaling approximately 28 acres located in the Bronx, New York at the intersection of 149th Street and the East River (the "Premises").

25.    Britestarr purchased the Premises using a loan it had obtained from Lloyd's Bank Plc ("Lloyd's").

26.     The loan from Lloyd's was secured by, *inter alia*, (a) a mortgage on the Premises; and (b) a pledge agreement by which all the outstanding shares of Britestarr stock (issued in Plaintiff's name) were pledged to Lloyd's as collateral security (the "Pledge Agreement").

27.     Plaintiff, acting on her husband's instructions, also gave a personal guaranty of payment for the loan in favor of Lloyd's.

28.     Plaintiff did not read or review any of the documents relating to the loan from Lloyd's before signing the documents, but simply signed them pursuant to her husband's instructions.

29.     Plaintiff and David Norkin separated in or around 1989 and were divorced in or around 1990.

<u>David Norkin's Personal Loan and Filing for Bankruptcy Protection</u>

30.     In or around 1995, David Norkin personally borrowed over $500,000 from two lenders: Craig Galea ("Galea") and Mark Kruse ("Kruse").

31.     That loan was secured with mortgages on the Premises, even though the Premises were owned by Britestarr and not by David Norkin personally.

32.     In 1996, following a dispute with David Norkin, Galea and Kruse filed suit against Britestarr and David Norkin (the "Galea/Kruse Litigation").

33.     In or about January 1997, David Norkin filed for personal bankruptcy protection in Connecticut bankruptcy court under Chapter 11 of the U.S. Bankruptcy Code (the "David Norkin Bankruptcy"), which stayed the Galea/Kruse Litigation.

## The ABB Option Agreement

34.     In or around December 1998, David Norkin caused Britestarr to enter into an option agreement with ABB under which ABB received a three-year option to purchase the Premises in return for payments to Britestarr totaling as much as $1.4 million (the "Option Agreement").

35.     At the time ABB entered into the Option Agreement, it envisioned constructing a power plant on the Premises.

36.     Had ABB exercised its option to purchase the Premises under the Option Agreement, it would have paid Britestarr not less than $31.4 million for the Premises.

37.     As a condition of the closing, the Option Agreement required Britestarr to deliver the Premises free and clear of all liens.

38.     In approximately October 2000, ABB learned about the Galea/Kruse Litigation against Britestarr, and asserted that the Galea/Kruse Litigation would prevent Britestarr from delivering the Premises free and clear of all liens.

39.     On or about November, 29, 2000, ABB declared that Britestarr's failure to disclose the Galea/Kruse Litigation constituted a default under the Option Agreement and claimed the right to withhold a $300,000 payment that was otherwise due to Britestarr on December 1, 2000.

40.     Britestarr, in turn, declared ABB to be in default under the Option Agreement for failing to make that payment.

41.     The Option Agreement provided ABB with ninety days to cure its default.

42.     During the 90-day cure period, ABB presented Britestarr with several proposals for extending the Option Agreement.

43.     On or about March 13, 2001, ABB withdrew all outstanding offers concerning an extension of the Option Agreement and filed suit against Britestarr in New York state court seeking assurances that Britestarr would perform its obligations under the Option Agreement (the "Option Litigation").

44.     The court in the Option Litigation issued a temporary restraining order that prohibited Britestarr from selling the Premises.

ABB's Acquisition of the Lloyd's Note and The Agreement with Plaintiff

45.     By the summer of 2001, Britestarr had defaulted on the loan from Lloyd's, leading Lloyd's to commence litigation to enforce its rights.

46.     Through the action commenced by Lloyd's, ABB learned that Lloyd's was holding all the outstanding shares of Britestarr stock, which Plaintiff had pledged as collateral for the loan under the Pledge Agreement.

47.     Soon after, ABB entered into an agreement with Lloyd's to acquire all of Lloyd's rights arising from its loan to Britestarr, including all Lloyd's rights under the note, the mortgage, the Pledge Agreement and Plaintiff's personal guaranty.

48.     In or around October 2001, ABB approached Plaintiff with an offer to acquire all her rights to her shares in Britestarr that had been pledged to Lloyd's in return for ABB's agreement to forbear on enforcing Plaintiff's personal guaranty and the payment of additional cash consideration.

49.     After several weeks of negotiation, during which both sides were represented by counsel, Plaintiff and ABB reached an agreement, which was

memorialized in a written contract dated as of November 21, 2001 (the "2001 Agreement"). (A copy of the 2001 Agreement is attached hereto as Exhibit 1.)

50.    As relevant here, the 2001 Agreement provides that Plaintiff would consent to allowing ABB to acquire or retain all her rights in the Britestarr stock that was pledged to Lloyd's in return for ABB's cancelation of any indebtedness that Plaintiff may owe under the original loan between Lloyd's and Britestarr.

51.    In addition, the 2001 Agreement provided that ABB would pay Plaintiff $60,000 upon execution of the 2001 Agreement plus additional installments payments in an amount between $240,000 and $450,000, with the final amount to be determined by a formula set forth in the 2001 Agreement.

52.    Further, if instead of building a power plant, ABB sold, transferred or disposed of interests in the Premises resulting in a net benefit to ABB in excess of $10,000,000 after the payment of certain costs and expenses, Plaintiff would be entitled to receive so-called "Supplement Consideration" pursuant to ¶ 5 of the 2001 Agreement:

> Supplemental Consideration.  [Plaintiff] or her designee shall be entitled to receive payment from ABB in the event of the sale, transfer or disposition of the Premises or any interest therein to any consideration equal to the lesser of the Equity in the Premises and $1,500,000 (the "Supplemental Payment").  The "Equity in the Premises" shall mean any value received by ABB in the aggregate from the sale, transfer or disposition of the Premises or interest therein in excess of the sum of $10,000,000 and all costs and expenses necessary to satisfy or discharge taxes, liens and encumbrances as well as those relating to the sale, transfer or disposition of the Premises.  This payment obligation shall arise only if (i) there is a sale, transfer or disposition of the Premises or an interest therein and (ii) [Plaintiff] is given an Abandonment Notice together with a certificate attesting to same.

OPP, Inc. Commences Litigation Against David Norkin To
Resolve Their Competing Claims of Ownership in Britestarr's Stock

53.     Despite David Norkin having caused all of Britestarr's outstanding shares to have been issued in Plaintiff's name, and Plaintiff having executed the Pledge Agreement in favor of Lloyd's, David Norkin claimed that, pursuant to the terms of his 1990 separation agreement with Plaintiff, he had acquired all ownership rights in Britestarr's stock from Plaintiff, and that whatever rights ABB might have obtained from Plaintiff under the 2001 Agreement were inferior to his own.

54.     In or around November 2001, ABB sold and assigned its rights in the Option Agreement to defendant OPP, Inc.

55.     Upon information and belief, OPP, Inc. was formed and is owned and controlled by Smith, a former employee of ABB who was involved with ABB's efforts to acquire the Premises and develop a power plant.

56.     Seeking to establish that it, and not David Norkin, had superior rights in Britestarr, in or around December 2001, OPP, Inc. commenced an adversary proceeding against David Norkin in the David Norkin Bankruptcy seeking a determination that OPP, Inc., as assignee of ABB's rights under the Option Agreement, was the sole owner of all outstanding shares of Britestarr and that David Norkin had no interest in same (the "OPP, Inc./Norkin Adversary Proceeding").

ABB Transfers and Assigns Its Rights and Obligations Under the 2001
Agreement and Formally Abandons Its Pursuit of the Power Plant Project

57.     Upon information and belief, in or around October 2002, ABB decided that it no longer wished and/or was unable to pursue the power plant project on the Premises.

58.    In or around November 2002, ABB transferred or sold its rights to develop a power plant on the Premises to defendant OPE.

59.    Upon information and belief, OPE was formed and, at all relevant times, has been owned or controlled by Smith.

60.    Also in or around November 2002, as part of the same transaction, ABB assigned its rights and obligations under the 2001 Agreement to OPP, Inc.

61.    On or about December 27, 2002, OPP, Inc. and Plaintiff each executed two written amendments to the 2001 Agreement in which OPP, Inc. acknowledged and agreed that ABB had assigned its rights and obligations under the 2001 Agreement to OPP, Inc.  (Copies of the first and second amendments to the 2001 Agreement are attached as Exhibit 2.)

62.    The amendment to the 2001 Agreement did not modify or alter Plaintiff's right to receive Supplemental Consideration, and ABB's obligation to pay Plaintiff Supplemental Consideration was one of the obligations assumed by OPP, Inc.

63.    Upon information and belief, shortly after the transactions described above between and among ABB, OPP Inc. and OPE, Smith caused 100% of the stock of OPP, Inc. to be transferred to OPE.

64.    In or around December 2002, ABB sent a notice to Plaintiff, effective as of November 8, 2002, informing Plaintiff that ABB had abandoned its plans to develop a power plant at the Premises, which was a condition precedent to Plaintiff receiving Supplemental Consideration under ¶ 5 of the 2001 Agreement.

Settlement of the OPP, Inc./Norkin Adversary Proceeding

65.    In or around May 2002, just days before an evidentiary hearing was scheduled in the OPP, Inc./Norkin Adversary Proceeding, Britestarr filed a petition in Connecticut bankruptcy court for relief under Chapter 11 of the U.S. Bankruptcy Code (the "Britestarr Bankruptcy").

66.    In or around January 2003, following many months of negotiations, the trustee in the David Norkin Bankruptcy reached an agreement with OPP, Inc. to settle the OPP, Inc./Norkin Adversary Proceeding (the "OPP, Inc./Norkin Settlement Agreement").

67.    Under the court-approved OPP, Inc./Norkin Settlement Agreement, the trustee agreed to release all rights that David Norkin or his bankruptcy estate claimed in the outstanding shares of Britestarr and acknowledged OPP, Inc.'s ownership of same in return for OPP, Inc.'s agreement to pay, among other things, all unsecured claims in the David Norkin Bankruptcy, which amounted to approximately $5,000,000.

The Formation of OPP LLC, the Successor To Britestarr

68.    Upon information and belief, in or around March 2004, Smith formed or caused OPP, Inc. to form defendant OPP LLC, which, at all relevant times, has been owned or controlled by Smith.

69.    Upon information and belief, OPP, Inc. is the sole member of OPP LLC, and, at or around the time of OPP LLC's formation, made a capital contribution to OPP LLC of OPP, Inc.'s rights and obligations under the OPP, Inc./Norkin Settlement Agreement, including all OPP, Inc's interest in the Premises.

70.     In or about June 2004, the bankruptcy court overseeing the Britestarr Bankruptcy approved a plan of reorganization for Britestarr (the "Plan of Reorganization").

71.     Under Britestarr's Plan of Reorganization, once certain conditions were met, title to the Premises would be transferred to OPP LLC, free and clear except for certain "Permitted Encumbrances" identified in the Plan of Reorganization.

OPP LLC Acquires Title To the Premises and Immediately
Obtains $16.5 Million in Loans To Develop the Premises

72.     On or about June 26, 2009, the bankruptcy court overseeing the Britestarr Bankruptcy entered an order to effectuate the Plan of Reorganization.

73.     Among the Permitted Encumbrances authorized in the order effectuating Britestarr's Plan of Reorganization was a $7,000,000 mortgage on the Premises, which was given to secure a loan made by Jetro Hunts Point OTP, LLC ("Jetro") to Britestarr as of June 24, 2009.

74.     Under the terms of the Plan of Reorganization, upon OPP LLC's formal acquisition of title to the Premises from Britestarr, OPP LLC would receive the proceeds of the $7,000,000 loan from Jetro and assume the mortgage.

75.     A deed transferring the Premises from Britestarr to OPP LLC was executed on July 7, 2009.

76.     Also on July 7, 2009, OPP LLC entered into three additional loan agreements with Jetro, totaling $9,500,000, each of which was secured by a mortgage on the Premises:   (a) a loan in the amount of $3,700,000 identified in the mortgage documents as the "Building Loan Mortgage; (b) a loan in amount of $2,800,000, identified in the mortgage documents as the "Project Loan Mortgage"; and (c) a loan in

the amount of $3,000,0000 identified in the mortgage documents as the "Environmental Escrow Mortgage."

77.     By mortgaging the Premises and assuming the existing Jetro mortgage in order to obtain funds to operate and improve the Premises, defendants disposed of or caused the disposition of interests in the Premises totaling $16,500,000.

OPP LLC Sells a Portion of the Premises to a Jetro Affiliate for Over $22 Million

78.     On or about November 10, 2010, OPP LLC sold a portion of the Premises to JDMH Real Estate of Hunts Point LLC ("JDMH") for a total purchase price of $22,296,000.

79.     According to documents executed by the parties at the time of the closing, Jetro and JDMH share the same office and, upon information and belief, are affiliated entities.

Plaintiff Demands Payment of the Supplemental Consideration

80.     Following the sale of a portion of the Premises to JDMH, Plaintiff, acting through counsel, contacted Smith to obtain information about the partial sale and the other dispositions of interests in the Premises that had occurred to determine whether defendants had consummated one or more transactions that individually or in the aggregate triggered Plaintiff's right to receive Supplemental Consideration under the 2001 Agreement.

81.     Based on the information provided by Smith, Plaintiff concluded that the net aggregate value of the interests in the Premises that were sold, transferred or disposed of as a result of the 2009 mortgages and the 2010 sale of a portion of the

Premises, after deducting for costs and expenses, exceeded $10,000,000 and, accordingly, she is entitled to receive Supplemental Consideration under ¶ 5 of the 2001 Agreement.

82.     Plaintiff, acting through counsel, has demanded that defendants pay Plaintiff the Supplemental Consideration to which she is entitled under ¶ 5 of the 2001 Agreement.

83.     Smith, acting on behalf of all defendants, has denied that any Supplemental Consideration is due to Plaintiff under ¶ 5 of the 2001 Agreement, and has refused Plaintiff's demands for payment.

<u>AS AND FOR A FIRST CAUSE OF ACTION</u>
(Breach of Contract)

84.     Plaintiff repeats and realleges the foregoing paragraphs of the complaint as if fully set forth herein.

85.     Plaintiff and ABB are parties to the 2001 Agreement, and OPP, Inc. has assumed, accepted and/or acquired ABB's obligations to Plaintiff under the 2001 Agreement pursuant to a written assignment from ABB.

86.     By reason of the transactions described above between and among OPP. Inc., OPP LLC and OPE that were orchestrated by Smith, OPP LLC and OPE have also assumed, accepted and/or acquired obligations to Plaintiff under the 2001 Agreement.

87.     Plaintiff has fully performed her obligations under the 2001 Agreement.

88.     Defendants have breached the 2001 Agreement by failing and refusing to pay Plaintiff the amount due to her as Supplemental Consideration under the 2001 Agreement.

89.     All conditions precedent requiring defendants to pay Supplemental Consideration to Plaintiff under the 2001 Agreement have occurred or been waived by the actions of defendants or their assignor(s).

90.     As a result of the breach of the 2001 Agreement, Plaintiff has been damaged in an amount to be determined at trial, but not less than $1,500,000.

AS AND FOR A SECOND CAUSE OF ACTION
(For an Order Permitting Plaintiff to Pierce or Disregard the Corporate or LLC Form)

91.     Plaintiff repeats and realleges the foregoing paragraphs of the complaint as if fully set forth herein.

92.     Smith formed OPP, Inc. to acquire ABB's rights in the Premises and, having acquired such rights, OPP, Inc. has assumed ABB's obligation to Plaintiff to pay Supplemental Consideration under ¶ 5 of the 2001 Agreement.

93.     Upon information and belief, at all relevant times, Smith has directly or indirectly owned 100% of the stock of OPP, Inc. and has exercised complete domination and control over OPP, Inc.

94.     Upon information and belief, at all relevant times, Smith has been the sole member, sole managing member and sole owner of OPE and has exercised complete domination and control over OPE.

95.     Upon information and belief, Smith caused OPP, Inc. to transfer 100% of OPP, Inc.'s stock to OPE.

96.     Upon information and belief, at all relevant times, OPP, Inc. has been the sole member, sole managing member and sole owner of OPP LLC, the current owner of the Premises, and has exercised complete domination and control over OPP LLC.

15

97.     At all relevant times, by and through his ownership or control of OPP, Inc., Smith has exercised complete domination and control over OPP LLC.

98.     At all relevant times, by and through his ownership or control of OPE, Smith has enabled OPE to exercise complete domination and control over OPP, Inc. and, in turn, over OPP LLC.

99.     Although OPP, Inc. obtained the rights to acquire the Premises from ABB, when the Premises were eventually acquired in 2009, instead of acquiring the Premises in the name of OPP, Inc., Smith caused the Premises to acquired and held by OPP LLC.

100.    Upon information and belief, the transaction orchestrated by Smith in causing OPP, Inc.'s rights in the Premises to be transferred to OPP LLC was undertaken without adequate consideration and left OPP, Inc. with inadequate capitalization to pay its debts, including the Supplemental Consideration owed to Plaintiff under ¶ 5 of the 2001 Agreement.

101.    Although the Premises are ostensibly owned by OPP LLC, Smith has informed Plaintiff and her representatives that he has routinely and repeatedly commingled his personal assets with those of the other defendants that he owns or controls by personally paying costs and expenses associated with owning, operating and maintaining the Premises.

102.    Through his direct or indirect ownership of and control over OPP LLC, Smith caused OPP LLC to obtain $16,500,000 in funding secured by interests in the Premises in 2009, and subsequently sold a portion of the Premises in 2010 for $22,296,000, transactions which directly or indirectly benefitted all defendants.

103.    Through his actions identified above, Smith, individually and/or on behalf of the business entities that he directly or indirectly owns or controls, has abused the privilege of doing business in the corporate or LLC form and has acted wrongly or unjustly by selling, transferring or disposing of interests in the Premises by causing same to occur in a manner intended to benefit defendants while seeking to defraud or avoid paying the amount owed to Plaintiff as Supplemental Consideration under ¶ 5 of the 2001 Agreement.

104.    To the extent that any defendant held liable to Plaintiff under the 2001 Agreement has insufficient assets to pay the Supplemental Consideration owed to Plaintiff because assets owned by that defendant were transferred without adequate consideration, this Court should enter an Order allowing Plaintiff to disregard or pierce the corporate or LLC form and recover damages directly from any defendant that has an interest in the Premises or other assets intended to be used to pay the Supplemental Consideration under the 2001 Agreement.

WHEREFORE, Plaintiff demands judgment as follows:

A.    On the First Cause of Action, damages in an amount to be determined at trial of not less than $1,500,000;

B.    On the Second Cause of Action, allowing Plaintiff to disregard or pierce the corporate or LLC form to recover damages from any defendant who received assets from another defendant without adequate consideration for the purpose of avoiding payment of Plaintiff's claim under the 2001 Agreement;

C.    The costs of suit and prejudgment interest; and

D.    For such other and further relief as is just and proper.

17

Dated: New York, New York
       June 18, 2015

                                GREENBERG FREEMAN LLP


                                By:_____/s/ *Michael A. Freeman*_____
                                       Michael A. Freeman (MF-9600)
                                       110 East 59th Street, 22nd Floor
                                       New York, New York  10022
                                       (212) 838-3121
                                       Attorneys for Plaintiff

18